

**SPODEK LAW GROUP** P.C.

Treating you like family since 1976

**Todd A. Spodek, Esq.**
Direct Dial: (347) 292-8633
ts@spodeklawgroup.com

The Honorable John J. McConnell, Jr.
Chief United States District Judge
United States District Court
District of Rhode Island
John O. Pastore Federal Building
1 Exchange Terrace
Providence, RI 02903

        RE:   United States v. John O'Brien
               Docket No.: 25-cr-117
               Sentencing Memorandum

Dear Judge McConnell:

As Your Honor is aware, this office represents Defendant John O'Brien (hereinafter, "Mr. O'Brien", "O'Brien", or "John") in the above-captioned matter, which is presently scheduled for sentencing before Your Honor on Thursday, March 12, 2026. To that end, Mr. O'Brien, through the undersigned counsel, respectfully submits this letter brief addressing his position and request as it relates to the sentence to be imposed.

On December 11, 2025, Mr. O'Brien pleaded guilty to a single-count Information charging him with Wire Fraud in violation of 18 U.S.C. §1343. Pursuant to the plea agreement in this matter, the Government will recommend that the Court impose a term of imprisonment no greater than 56 months. Mr. O'Brien has been detained since his arrest on April 3, 2025. Because he is not a citizen of the United States, he is subject to an Order of Removal by United States Immigration and Customs Enforcement (ICE) (PSR ¶ 80). For the reasons contained herein, O'Brien respectfully requests that the Court impose a sentence of 36 months' imprisonment.

Mr. O'Brien acknowledges that he committed a serious offense and has taken full responsibility for his actions. None of the arguments contained herein are intended to excuse his conduct or avoid acceptance of responsibility. Rather, they are intended to highlight the reasons for which a sentence of 36 months' imprisonment is sufficient, but

Honorable John J. McConnell, Jr.
Page 2

not greater than necessary, to comply with the purposes of sentencing enumerated in 18 USC §3553(a).

## LEGAL STANDARD

As the Court is aware, the sentencing Guidelines are not binding and do not incorporate all of the sentencing purposes or factors set forth in 18 USC §3553(a). The United States Supreme Court, in *Pepper v. United States*, 562 U.S. 476, 491 (2011), emphasized that a sentencing judge assumes "an overarching duty under §3553(a) to 'impose a sentence sufficient, but not greater than necessary' to comply with the sentencing purposes set forth in §3553(a)(2)." Those purposes are "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." In addition, the Court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant, and the kinds of sentences available. 18 U.S.C. §3553(a). A court must impose a lesser sentence if it is sufficient to comply with §3553(a)'s sentencing purpose. *United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010).

## APPLICABLE SENTENCING GUIDELINES

As noted in the PSR, the Defendant filed two objections relating to two separate enhancements imposed by Probation in this matter. The first objection pertains to the application of a two-level enhancement pursuant to U.S.S.G. §2B1.1(b)(10)(A) on the grounds that Mr. O'Brien relocated, or participated in relocating a fraudulent scheme to another jurisdiction to evade law enforcement. This enhancement requires two-elements: (1) relocation (or participation in relocation) of a fraudulent scheme to another jurisdiction; and (2) that the relocation was undertaken with the intent to evade law enforcement or regulatory officials. *United States v. Savarese*, 686 F.3d 1, 15 (1st Cir. 2012). The Government must prove the applicability of this enhancement by a preponderance of the evidence. *United States v. Flete-Garcia*, 925 F.3d 17, 26 (1st Cir. 2019).

While Courts have held that a defendant need not be motivated by a "specific threat of arrest," and a more general intent to evade law enforcement is enough for the enhancement to apply, *United States v. Vega-Iturrino*, 565 F.3d 430, 433 (8th Cir. 2009), there must still be some nexus between the relocation and the general intent to evade law enforcement, as by design, many offenses are intended to and include a general

Honorable John J. McConnell, Jr.

Page 3

intent to evade law enforcement scrutiny. In *United States v. Thung Van Huynh*, 884 F. 3d 160 (3d Cir. 2018), the Court noted that the enhancement targets schemes that are moved to avoid detection, not those that expand for economic or other non-evasive purposes.

Here, Mr. O'Brien advised Probation that he expanded into Rhode Island due to increased competition in Massachusetts and in pursuit of greater financial opportunity. Specifically, the PSR states that O'Brien "said he faced some competition in Massachusetts, so he expanded his base and procured work in Rhode Island until his arrest in March 2025" (PSR ¶ 64). This explanation is consistent with the record. Construction and masonry work in the New England region routinely crosses state lines, particularly between Massachusetts and Rhode Island. More importantly, because Massachusetts has a much larger size and population than Rhode Island, O'Brien would face significantly more competition in the former as opposed to the latter.

The PSR lists a number of steps O'Brien took to conceal his scheme and avoid detection, such as using multiple business names and addresses, and opening multiple personal bank accounts to conceal proceeds. But concealment is analytically distinct from relocation. These types of efforts to conceal wrongdoing are common in many fraud cases. Similar to O'Brien moving his family to the United States for better opportunity, he moved his business operations from Massachusetts to Rhode Island for the same reasons. The Government has not shown by a preponderance of the evidence that O'Brien's expansion into Rhode Island was part of his general intent to avoid detection.  As a result, O'Brien's offense level should be decreased by two levels.

Additionally, The PSR applies a four-level enhancement pursuant to U.S.S.G. §3B1.1(a), concluding that Mr. O'Brien was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive. Respectfully, the record does not support the application of this enhancement.

Section 3B1.1(a) applies only where (1) the criminal activity involved five or more participants or was otherwise extensive, and (2) the defendant acted as an organizer or leader. A "participant" is defined in Application Note 1 as a person who is criminally responsible for the commission of the offense. Individuals who are unwitting and unaware of the unlawful nature of the conduct, or merely performing labor without knowledge of the fraudulent scheme, cannot be counted as participants. In addition, other individuals the Defendant may have informed about the scheme, but did not manage or direct as part of the scheme, cannot be counted as participants.

In order to apply such an enhancement, the sentencing court must make a specific finding which identifies those being managed "with enough particularly to give

Honorable John J. McConnell, Jr.
Page 4

credence to the upward adjustment." *United States v. McDowell,* 918 F.2d 1004, 1011 (1st Cir. 1990). Without reasonably specific findings or some satisfactory surrogate in the record, the Court is "unable to engage in meaningful review." *United States v. Van,* 87 F.3d 1, 2-3 (1st Cir. 1996). In *United States v. Medina,* 167 F.3d 77, 80 (1st Cir. 1999), the First Circuit remanded back to the District Court on this issue, as it was unable to speculate about the defendant's managerial role because the PSR contained no explicit analysis of the defendant's managerial or supervisory activities.

In the instant case, the PSR references several unnamed individuals as "participants" despite no concrete evidence that these individuals had knowledge or criminal culpability, and most if not all of these individuals are unknown. For example, the PSR references day laborers and other individuals of presumed Irish descent who appeared at job sites, and certain third parties allegedly involved in financial transactions. However, these references are speculative, and do not identify anyone in any more detail than simply stating John had received or forwarded a text message from them (PSR ¶ 27-30).

There is no indication that any day laborers understood that any repairs were allegedly unnecessary, that any misrepresentations were being made to homeowners directly by these laborers, or that they shared any intent to defraud. By Mr. O'Brien's account, the day laborers he hired had limited to no English proficiency, were instructed to perform construction-related tasks, and were not directed to cause damage or provide knowing misrepresentations.

The PSR also states that victims reported "at least two other Irishmen visited their properties," and on at least one occasion, "O'Brien informed the victims that he would be sending other team members to visit their properties." (PSR ¶ 25). But the fact that some of the victims may have seen other Irish people on their properties, or that at least one of them was told other team members would visit does not mean that these individuals were complicit or knowledgeable of O'Brien's conduct. The PSR does not point to one named, known individual cognizant of O'Brien's illegal conduct, leaving the Court to speculate on whether any of them were truly participants within the meaning of §3B1.1(a).

At most, if the Court were to find that Mr. O'Brien exercised some degree of management over fewer than five criminally responsible individuals, the appropriate enhancement would be §3B1.1(c), which provides for a two-level increase. However, the present record does not support application of the four-level enhancement under §3B1.1(a). Absent further support that the laborers or individuals to whom O'Brien corresponded with were actively aware of and participated in O'Brien's fraudulent conduct, the four-level enhancement is misapplied here.

Honorable John J. McConnell, Jr.
Page 5

Finally, while not a formal objection, it is important to consider the massive enhancement applied to O'Brien under §2B1.1 for the loss amount in this matter. The disproportionate loss Guidelines further militate in favor of a shorter sentence in this matter. There is broad consensus that the loss table under §2B1.1, formulated without an empirical approach, produces unduly harsh sentencing that bear little or no connection to the seriousness of the offense. *See, e.g., United States v. Johnson*, 2018 WL 1997975, *3 (S.D.N.Y. Apr. 26, 2018) (criticizing lack of "empirical approach" for loss guideline; "That this situation continues unabated is a great shame for the many offenders sentenced…who do not receive a sentence that makes any sense for the actual crime of conviction."); *United States v. Fabish*, 2015 WL 4637013 *2 (E.D.N.Y. Aug. 3, 2015) ("The loss table is but one example of the seemingly mindless acceleration of penalties for economic crimes incorporated in the current Sentencing Guidelines regime."); *United States v. Moody*, 2013 U.S. Dist. LEXIS 109506 *13-14* (D. Colo., Aug. 15, 2013); *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("numbers assigned…apear to be more the product of speculation , whim, or abstract number-crunching than of any rigorous methodology"), *aff'd*, 747 F.3d 111 (2d Cir. 2014); *United States v. Lenagh*, 2009 WL 296999, at *3 (D. Nef. Feb. 6, 2009) (giving fraud Guidelines "less deference" for not being empirically grounded); *United States v. Parris*, 573 F. Supp. 2d 744, 745, and 754 (E.D.N.Y. 2008) (criticizing loss tables as "patently absurd" and a "black stain on common sense."). Courts have concluded that imposing sentences corresponding to the loss tables would "effectively guarantee that many such sentences would be irrational on their face." *Gupta*, F. Supp. 2d at 351.

In line with this broad consensus regarding the loss Guidelines, on August 6, 2025, the U.S. Sentencing Commission published its priorities for amending the Sentencing Guidelines in the latest amendment cycle.[1] One of the priorities that the Commission identified as a priority for amendment was a reexamination of the role of actual loss, intended loss, and gain as well as whether the loss table in §2B1.1 should be revised. Specifically, the Commission's notice in the Federal Register stated:

> (3) Examination of §2B 1.1 (Theft, Property Destruction, and Fraud) and related guidelines to ensure the guidelines appropriately reflect the culpability of the individual and the harm to the victim, including (A) reassessing the role of actual loss, intended loss, and gain; (B) considering whether the loss table in §2B 1.1 should be revised to simplify application or to adjust for inflation; (C) considering the application and impact of the victims table in §2B 1.1 and adjustments in Chapter Three, Part A (Victim-Related Adjustments), relating to victims; (D) considering the application and impact of adjustments in Chapter Three, Part B

---

[1] U.S. SENT'G COMM'N, Federal Register Notice of Final 2025-2026 Priorities, https://www.ussc.gov/policymaking/federal-register-notices/federal-register-notice-final-2025-2026-prioritie s

Honorable John J. McConnell, Jr.

Page 6

(Role in the Offense) relating to role in the offense; and (E) possible consideration of amendments that might be appropriate.

Here, O'Brien's base offense level is 7, and the application of the loss table in §2B1.1 inflates the offense with a 16-point enhancement (PSR ¶ 43). This is in addition to the additional eight points O'Brien received in other enhancements, ballooning his total offense level up to a 31, with three-point reduction for acceptance of responsibility slightly bringing the total offense level down to 28.

In *United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012), the First Circuit upheld the District Court's decision to impose a below-Guidelines sentence to six months of home monitoring and three years of probation, when the Guidelines were calculated at 87-108 months after applying an 18-point enhancement for a $5.2 million loss amount under §2B1.1. The District Court's major rationale for this massive variance was that it did not believe the Guidelines range, "driven largely by the loss estimate," accurately reflected the defendant's culpability. *Id.* at 39. The Court noted that absent this 18-point escalation pursuant to §2B1.1, the defendant "would be looking at an 8 to 14-month range with a Zone C alternative sentence available to the Court."

In upholding the sentence, the First Circuit in *Prosperi* stated that "a sentencing court should not consider itself constrained by the guidelines to the extent that there are sound, case-specific reasons for deviating from them. However, if a court chooses to impose a sentence outside the guidelines range, [t]he court's reasons for deviation should typically be rooted either in the nature and circumstances of the offense or the characteristics of the offender, must add up to plausible rationale; and must justify a variance of the magnitude in question. *Id.* at 42, quoting *United States v. Martin*, 520 F.3d 87 (1st Cir. 2008) at 91.

As in *Prosperi*, Mr. O'Brien's Guidelines range was substantially increased by a 16-point enhancement tied solely to the loss amount, which does not take into account O'Brien's lack of criminal history, acceptance of responsibilty, or exemplary conduct while detained. In addition, while O'Brien stipulated to a loss amount of more than $1.5 million in unnecessary home repairs between July 2021 and March of 2025, the PSR notes that "due to the nature of the scheme and the fact that some work was performed, it is difficult to precisely ascertain how much of the work was truly necessary" (PSR ¶ 4). Indeed, regardless of O'Brien's fraud, the fact remains that there were real crews performing real construction and providing measurable value to homeowners.

Importantly, the PSR does not account for the value of work actually performed by O'Brien. Under the Guidelines, loss should be reduced by the fair market value of

Honorable John J. McConnell, Jr.
Page 7

services rendered, but that has not happened here. By ignoring the value of completed work, the loss figure overstates the harm and inflates the Guidelines range.

## §3553(a) FACTORS AS APPLIED TO O'BRIEN

John O'Brien was born on July 29, 1997, in Ballyfermot, Dublin, Ireland to married parents John Sr. and Caroline O'Brien. While the family struggled financially, John enjoyed a loving and supportive relationship with his siblings and parents, which persists into the present day. John and his brother and sister, Thomas and Caroline O'Brien, grew up in a poor part of town, and because John's parents could not afford to buy him many things, they encouraged him to participate in recreational activities and sports such as football and soccer to keep him busy and content (PSR ¶ 62). Despite keeping himself busy, John was acutely aware of his family's financial struggles, which affected the decisions he made in adolescence and adulthood. For example, when John was fifteen years old, he dropped out of school in order to assist his father with the family's struggling landscaping business (PSR ¶ 63).

In a letter of support submitted by John's father, he recounts the dangerous neighborhood in which John grew up, where local youths were lured into gangs that sold drugs and committed acts of violence. John Sr.'s biggest fear was that his children would be bullied into joining local gangs, so he did everything he could to keep John away from improper influences. (See attached "Exhibit A" for the many letters of support and character references submitted on Mr. O'Brien's behalf).

John grew up in a religious household that always believed in church and charity, and these values are still deeply ingrained in him. Friar Stephen Monaghan, who has known John since he was a child, submitted a character reference explaining that John's father's "only objective in life was to steer John away from trouble and give him a trade and a skill that would allow him to better himself in life." He has always known John to be reliable, hard-working, trustworthy, and law-abiding, noting that he never ran into any legal trouble other than one minor traffic violation, and has great respect for law enforcement (Ex. A).

John's aunt, Margaret Anne O'Brien, has dedicated her life to raising money in humanitarian aid to help impoverished people of Ethiopia. She remembers frequently walking around Dublin with John, who carried a bucket to collect money for these causes. In 2016, he helped raise money to build a school in Ethiopia, which was completed in 2018. Ms. Margaret characterizes her nephew as "one of the most caring loving people you would ever meet and such a loving father and husband to his wife in kids" (Ex. A).

Honorable John J. McConnell, Jr.
Page 8

John also has deep ties to his local community in Ballyfemort. For example, Senator Eileen Flynn, a former community activist from Ballyfermot who was appointed to the upper house of Irish parliament in 2020, submitted a letter explaining that John's "generosity extends beyond his family circle to his work in the community, where he has dedicated considerable time to supporting others." She describes John's commitment to his faith and to helping others as "remarkable," and believes that John's return to Ireland would benefit not only his family, but the community as a whole (Ex. A).

Further, since its inception in 2002, John's family worked closely with the Ballyfermot Traveller's Action Project (BTAP), a community development project aimed at providing health, education, housing, and family development services to the Traveller community living in the Ballyfermot area in Dublin. According to BTAP coordinator Shay L'Estrange, John's work ethic was "second to none," and he regularly assisted the program throughout his life, including "the promotion of pro social behaviour among young people and the promotion of traditional Traveller culture." In her letter, Ms. L'Estrange also noted that in John's isolated section of Ballyfermot, "there is a very heavy dependence on family members for support. In the case of John's family, this is no different." She concludes by voicing concern for John's wife and children in his absence, noting that they are especially vulnerable at the moment (Ex. A).

When John was sixteen years old, he met the love of his life, Eileen. The two were married three years later, when John was only nineteen years old. They have now been married for almost ten years, and have three young children: John Jr., age 7, Eileen, age 4, and James, age 2. After John's arrest, Eileen and the children moved from Massachusetts back to Ballyfermot in Ireland, where they miss John terribly and anxiously await his return. Without John to support them, Eileen receives state assistance payments to keep the children fed and clothed. They currently live in a caravan at the rear of John's parents home, but this is only temporary, as the family will not be permitted to keep the caravan in place permanently (PSR ¶ 69-70; Ex. A).

When John and Eileen first married in 2016, John attempted to establish his own landscaping company, but struggled in many of the same ways as his father. For the next five years, John worked tirelessly to grow his business and provide for his family, especially after his first son was born. However, despite this hard work, John did not see much progress, which caused much frustration. When Eileen became pregnant again with their second child, she and John decided that although it was risky, they would move to America in search of a better life and better opportunities for themselves and their children. According to John's brother, Thomas, this move was motivated in part by "hearing all the great stories about the USA from friends and tourists and how it was the

Honorable John J. McConnell, Jr.
Page 9

best place to raise a family" (Ex. A). John and Eileen also became increasingly worried about raising children in their isolated part of Ballyfermot, which Eileen describes as "a very very rough place" marred by drugs, violence, fast cars, and other issues rendering it unsafe for children (See Exhibit B–video recorded by Eileen O'Brien, provided to the Court via Google drive).

Once in the United States, Eileen gave birth to their second child, and then had their youngest, James, two years later. John faced enormous pressure to build a business from the ground up in a new country with a growing family. The family rented a home in Massachusetts from Charles Jaeck, who grew fond of them. In a letter of support submitted to the Court, Mr. Jaeck recounts his experiences with John and his family, remembering them as "strongly religious," attending church every Sunday, baptizing their youngest son at the Cathedral of the Holy Cross in Boston, and always saying "god bless you" as a habit of speech. Mr. Jaeck described John as a humble and grateful family man who was always focused on his wife and children. (Ex. A).

Karine Correa, who was the babysitter for John's family in Massachusetts, also provided a letter echoing much of Mr. Jaeck's assessments of John and his family. She describes John as a "a man who was present, caring, and deeply connected to his family" and the source of his children's stability, love and guidance. She recounts how he never left home without giving each of his children a kiss goodbye, and worries for them and Eileen in his absence (Ex. A).

In Eileen's submission to the Court, she recounted the struggles she and John faced while he attempted to support the family in Ballyfermot before moving to America. She explained that John's life revolves around his children, and he would spend any free moment he had with them. She also discussed the remorse and regret John feels, and the impact his absence has had on their children. Ironically, John's desire to provide for his family played a role in his commission of the underlying offense, and now as a result of his conduct, he is completely unable to do so. Eileen explains that this is something she and her children must carry with them for the rest of their lives, but she remains fully supportive of John. Their son, John Jr., also recorded a video for the Court in which he provides a non-exhaustive list of all of the activities he and his father did together (See Exhibit C–video recorded by John O'Brien, Jr., provided to the Court via google drive).

Mr. O'Brien's commission of the underlying offense does not mean the principles and values ingrained in him since he was a child have vanished. Despite his actions, his dedication to his family, his faith, and his local community remains unchanged, and he is committed to rebuilding his life and supporting his family through legal and respectable

Honorable John J. McConnell, Jr.
Page 10

means once he returns to Ireland. As evidence of his rehabilitation, many of the law enforcement personnel at the Donald W. Wyatt Detention Facility, where O'Brien has been incarcerated since his arrest on April 3, 2025, have submitted letters to the Court attesting to his character and achievements.

Warden Michael Nesinger confirmed that John has remained free of any disciplinary infractions, completed several programs including obtaining his GED, and is currently participating in the Detainee Worker Program as a Pod Runner Worker (Ex. A). Both the facility's programs director and unit manager signed a letter attesting that O'Brien has demonstrated a great work ethic, shows initiative, received good work evaluations, maintains a positive attitude, and is respectful towards both staff and his peers. (Ex. A).

Sergeant Michael Davis submitted a letter lauding O'Brien for his "exemplary behavior", describing him as "a model detainee," and "an outstanding worker within the facility." He further commented that "O'Brien has used his time in custody productively and has demonstrated genuine efforts toward self-improvement and accountability. His actions reflect maturity, respect for authority, and a sincere desire to move forward in a positive and lawful direction." Sgt. Davis concluded that in his belief, O'Brien "is capable of contributing positively when given structure, responsibility, and opportunity" (Ex. A). This glowing review of O'Brien's reliable, trustworthy, dependable, and calm nature is submitted not by a loved one or friend, but by an unbiased law enforcement officer with authority over him. Sergeant Davis's letter should provide the Court with assurance that O'Brien is not only remorseful, but deeply and unwaveringly committed to self-improvement and contributing to his local community, even if that community is the Donald W. Wyatt Detention Facility.

As further evidence of rehabilitation and O'Brien's faith and remorse, Chaplain Leo Mogavero, who teaches Bible and Religious Studies at the detention facility, submitted a letter offering his "strongest and most positive recommendation" for a reduction of O'Brien's sentence. According to Chaplain Mogavero, John is truly remorseful and has never missed a class or one-on-one session to discuss his past transgressions and his positive desire for the future. He has personally witnessed John praying with other inmates and assisting them with their problems by sharing his own story. Chaplain Mogavero also emphasized the love O'Brien has for his family, and how important they are to him (Ex. A).

The number of letters submitted on O'Brien's behalf demonstrate that he has made an important and positive impact on the lives of so many different people across many different contexts and communities, including loved ones, neighbors, religious

Honorable John J. McConnell, Jr.
Page 11

leaders, senators, landlords, coaches, employees, community activists, law enforcement and jail personnel, and so many more. While his conduct in this matter caused substantial financial harm, O'Brien has also done an immeasurable amount of good in his only twenty-eight years of existence. Pursuant to §3553(a), the nature of the offense must be taken into account at sentencing, but so must the history and characteristics of the defendant. The Court has ample evidence showing that throughout his life, O'Brien has demonstrated honesty, integrity, kindness, selflessness, and respect for others, and by all accounts is a committed and loving husband and father.

As an additional consideration, any custodial sentence imposed in this matter will be followed by O'Brien's permanent removal from the United States, ensuring that he will not return to the community where his offense occurred. In practical terms, deportation operates as an additional and significant consequence of the conviction, and one that effectively eliminates any concern about future risk to the public in this or any jurisdiction in the United States. Further, the Order of Removal prevents O'Brien from earning First Step Act credits, which would otherwise shorten his sentence. He respectfully requests that the Court consider this reality when determining a sentence that is sufficient, but not greater than necessary to satisfy the purposes of sentencing under 18 U.S.C. §3553(a).

## CONCLUSION

For the foregoing reasons, Mr. O'Brien respectfully requests that in consideration of his lack of criminal history, deep community ties, lifelong charitable contributions, exemplary conduct while incarcerated, acceptance of responsibility, and dependent wife and three young children who suffer in his absence, the Court impose a sentence of 36 months' imprisonment, which is sufficient, but not greater than necessary, to comply with the sentencing directives enumerated in 18 U.S.C. §3553(a).

Respectfully submitted,
**Spodek Law Group P.C.**
Todd A. Spodek
/S/ Todd A. Spodek

cc:    Assistant United States Attorney Taylor Dean (By Email).